IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-7094
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

TOMMY D. MONTFORD, GREGORY ADAMAVICH
and DANIEL ADAMAVICH,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for
the Southern District of Mississippi
_____

(July 14, 1994)

Before REAVLEY, JONES and BENAVIDES, Circuit Judges.

REAVLEY, Circuit Judge:

       In this appeal we address whether gambling boat excursions a
few miles offshore to avoid the reach of state law are in
"foreign commerce" for purposes of certain federal criminal
statutes.  We conclude that such travels do not amount to foreign
commerce, and therefore reverse appellants' convictions.

                        BACKGROUND

       The Europa Jet, an American owned, Bahamian flagged vessel,
operated as a "cruise to nowhere" gambling ship out of Gulfport,
Mississippi.  The ship offered its passengers casino gambling.
It would travel briefly beyond three miles offshore on each

excursion in order to avoid the reach of Mississippi state law. During these gambling trips the vessel never docked at a foreign port or ventured anywhere close to the territorial waters of a foreign country.

The government contended through indictment and trial that appellants Tommy Montford, Gregory Adamavich and Daniel Adamavich were bookies who took illegal bets on football games that were communicated onshore through the use of a cellular phone aboard the Europa Jet. Montford and Gregory Adamavich worked on the vessel, solicited bets from others on the vessel, and then communicated onshore with the cellular phone. Daniel Adamavich received some of these calls and engaged in bookmaking operation at an onshore site in Mississippi. The three appellants and two other defendants were indicted on various counts of conspiring to violate and violating 18 U.S.C. §§ 1084 and 1952(a)(3). Each appellant was convicted on some counts.

## DISCUSSION

"When a federally created crime involves an area traditionally left to the domain of the states, the jurisdictional authority of the United States becomes a crucial part of the proof. . . . [I]t has been uniformly held that the basis for federal jurisdiction is an essential element of the offense." *United States v. McRary*, 665 F.2d 674, 678-9 (5th Cir. Unit B), *cert. denied*, 102 S. Ct. 2306 (1982). Hence, a violation of the Travel Act, 18 U.S.C. § 1952, requires travel in interstate or foreign commerce or use of a facility in interstate

2

or foreign commerce.[1]  Similarly, an essential element of 18

U.S.C. § 1084 is the transmission of bets or wagers in interstate

or foreign commerce.[2]  The government makes no argument that the

cellular phone calls from the Europa Jet to onshore sites in

Mississippi involved interstate commerce.[3]  The jury was only

instructed on foreign commerce.[4]  The case turns, therefore, on

---

[1]     Criminal liability under § 1952 "requires proof of (1) travel in interstate or foreign commerce, (2) specific intent to promote, manage, establish, carry on, or distribute the proceeds of `unlawful activity,' and (3) knowing and willful commission of an act in furtherance of that intent after the act of travel." *United States v. Abade*, 879 F.2d 1260, 1266 (5th Cir.), *cert. denied*, 493 U.S. 1005 (1989).

[2]     The elements of the offense are set out in § 1084(a), which by its terms provides:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more that $10,000 or imprisoned not more that two years, or both.

[3]     The government obtained convictions under three counts of the indictment.  Count 2, the § 1084 count, only alleged foreign commerce, as did Count 3, the Travel Act count.  Count 1, the conspiracy count, generally alleged both interstate and foreign commerce; however, all of the specific factual allegations in this count, including the alleged overt acts, were tied to cellular phone calls made on the Europa Jet during return trips from Gulfport, Mississippi to "International Waters" and back to Gulfport, which Count 1 characterized "use of cellular telephone facilities aboard the M/V Europa Jet while the vessel was engaged in foreign commerce . . . ."

[4]     The jury was instructed that it could find a defendant guilty under Count 1 only if it found, *inter alia*, the use of "a wire communication facility for transmission in foreign commerce . . . ."  Similarly, the jury was instructed that it must find foreign commerce in order to convict under Counts 2 and 3.

whether the vessel travelled in foreign commerce.  We cannot uphold a conviction "when the jury is instructed on only one jurisdictional ground which is contradicted by the evidence." *McRary*, 665 F.2d at 680.

The parties here disagree on whether the vessel ever entered international waters,[5] and appellants argue that there was no proof that the calls were made while the vessel was past the three-mile mark.  Our decision does not turn on these issues.  Instead, we hold that a "cruise to nowhere," where the vessel has no contact whatsoever with a foreign country or waters within the jurisdiction of a foreign country, and where indeed no such contact is intended, does not involve foreign commerce.

We begin our analysis by looking to relevant statutes.  18 U.S.C. § 10 provides:  "The term `foreign commerce,' as used in

_____

Foreign commerce was defined in the charge; interstate commerce was never defined.

[5]     The Europa Jet would travel briefly beyond the three-mile mark on each cruise.  It did not travel beyond the twelve-mile mark.  Historically, the territorial jurisdiction of the United States extends for three miles from the shore. *Argentine Republic v. Amerada Hess Shipping Corp.*, 109 S. Ct. 683, 692 n.8 (1989); *McRary*, 665 F.2d at 676-67 & n.4.  *McRary*, decided in 1982, concluded that while a "contiguous zone" extends from three to twelve miles from shore, the waters beyond the three-mile territorial limit are part of the high seas. *Id*.  Appellants argue that in December of 1988 President Reagan issued a proclamation extending the territorial sea of the United States to twelve miles from shore.  Presidential Proclamation No. 5928, 3 C.F.R. 547 (1988).  Hence, they contend that the Europa Jet never left the United States.  The government argues that the proclamation extended the territorial sea only for foreign policy purposes, pointing out that the proclamation states that nothing in it "extends or otherwise alters existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom . . . ."

4

this title, includes commerce with a foreign country." Of course this statute does not end our inquiry, since it does not state that foreign commerce is limited exclusively to commerce with a foreign country. The current § 10 consolidated and recodified prior provisions of Title 18. "Section 10 first appeared in the 1948 recodification of Title 18 . . . and the Revisor's Notes to that section state that it `consolidates into one section identical definitions contained sections 408, 408b, 414(a) and 419a(b) . . . .'" *United States v. Goldberg*, 830 F.2d 459, 467-68 (3d Cir. 1987) (Sloviter, J., dissenting in part). In these prior provisions "interstate or foreign commerce" was consistently defined to include "transportation from one State, Territory or the District of Columbia to another State, Territory, or the District of Columbia, or to a foreign country; or from a foreign country to any State, Territory, or the District of Columbia." *Id*. at 468; *McRary*, 665 F.2d 674. These prior definitions further suggest that Congress intended foreign commerce to mean travel to of from, or at least some form of contact with, a foreign state. *See Goldberg*, 830 F.2d at 468 ("The Revisor's Notes refer to `slight improvements in style' in the recodified version. However, there is no indication that Congress intended to broaden the definitions of `foreign commerce' . . . ."); *McRary*, 665 F.2d at 678 n.6 ("Section 2 of the Lindbergh law was apparently consolidated into 18 U.S.C. § 10, which was enacted in 1948 to combine the scattered definitions of interstate and foreign commerce. The mere

5

consolidation by the 1948 Revisors, of course, is not evidence of a change in legislative intent.").

We do not mean to suggest that Congress could not criminalize the conduct in question if it chose to do so. We note that the general provisions of Title 18 include a separate statute defining the "special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 7 defines that term to include:

> (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof . . . when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
>
> * * *
>
> (7) Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.

Several federal criminal statutes cover acts within the special maritime and admiralty jurisdiction of the United States. *E.g.* 18 U.S.C §§ 81 (arson), 113 (assault), 1111 (murder). The criminal statutes under which appellants were convicted, 18 U.S.C. §§ 1952 and 1084, do not contain such a jurisdictional basis.

The Lindbergh law covers kidnapping occurring both in foreign commerce and within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 1201(a)(1),(2). In *McRary*, we held that a kidnapping which involved an abduction on the high seas and transportation of the victim to Cuba did not

6

involve foreign commerce.  Our holding states "that the foreign commerce jurisdictional basis mandates that the kidnapping take place in the United States and that the victim be subsequently transported to a foreign State." *McRary*, 665 at 678.  Later, in *United States v. De La Rosa*, 911 F.2d 985 (5th Cir. 1990), we held that the foreign commerce jurisdictional basis of the kidnapping statute is sufficiently broad to cover an abduction in a foreign country and subsequent transportation to the United States.  *Id*. at 989 (1990).  We similarly held, in *Londos v. United States*, 240 F.2d 1 (5th Cir. 1957), that transportation of a counterfeit security from a foreign country to the United States was transportation in foreign commerce under 18 U.S.C. § 2314.  While none of these cases are controlling here, they all support our conclusion that foreign commerce requires some form of contact with a foreign state.

Fifth Pattern Jury Instruction 1.38, followed by the district court in its charge, provides:  "Foreign commerce means commerce or travel between any part of the United States and any place outside the United States."[6]  While one of our own pattern jury instructions certainly should be treated as persuasive authority, we believe that this definition is too broad when applied to our case, based on the discussion above.

Convictions REVERSED and acquittals ordered.

---

[6]    This particular instruction, unlike many of our other pattern jury instructions, cites no authority.