[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 10-15413

————————————————

D.C. Docket No. 1:09-cr-20470-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DWIGHT CARTER

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(July 24, 2012)

Before MARCUS and BLACK, Circuit Judges, and HODGES,* District Judge.

HODGES, District Judge:

——————————————

*Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

Dwight Carter appeals from his convictions and sentences for violations of the Hobbs Act, 18 U.S.C. § 1951(a), and other drug and firearms offenses arising out of the robbery and murder of an armored vehicle security guard.  After oral argument and careful review of the record, we affirm in all respects..

# I

Carlos Alvarado was employed in Miami-Dade County, Florida, as a security guard stationed aboard a Dunbar armored truck transporting cash collections made from various retail establishments.  A few minutes before 11:00 a.m. on Monday morning, December 1, 2008, Alvarado's armored truck entered the parking lot of the Dadeland Mall and parked near a store called The Express. Alvarado exited the truck and entered the mall.  He was carrying a holstered firearm, a cell phone and a fabric bag marked "Dunbar."  He then made several collections from stores in the mall and accumulated over $ 60,000.00 in his bag.

A few minutes before Alvarado entered the mall, witnesses observed two men moving around within and just outside the premises of The Express store. One was described as a large man, the other was described as smaller and thin in stature.[1]  Both men were wearing all black attire, and both were using cell phones,

---

[1]These general descriptions were compatible with the two persons ultimately identified as the perpetrators.  Carter is less than six feet tall and thin.  His accomplice, Emmanuel Maxime, is taller and heavier.

2

apparently talking to each other.  Images captured on surveillance cameras corroborated these observations.

As Carlos Alvarado approached the exit of The Express after making his collections, Carter and Emmanuel Maxime rushed into the store with firearms in their hands, yelling at Alvarado to drop his bag and get on the ground.  Instead, Alvarado reached for his holstered weapon and Carter responded by shooting at him at least eight or nine times.  Four of the shots found their mark, the last three having been fired after Alvarado had fallen to the floor.  Carter then grabbed Alvarado's Dunbar bag and he and Maxime fled the scene making a successful getaway.  An hour later, Carlos Alvarado was pronounced dead at the hospital.

Subsequent investigation focused attention on Carter and Maxime as suspects.  Investigating officers obtained driver's license photographs of both men and created six-person photographic arrays that were shown to four of the eye witnesses who had been at the mall.  Two of the witnesses identified Carter and two others identified Maxime as the perpetrators of the crime.  In addition, based upon an examination of cellular telephone records, it was determined that at the time of the robbery, Maxime was using a cell phone registered in his name, and Carter was using a cell phone registered in the name of his mother.  During the twenty minute period immediately before the robbery, Carter and Maxime

3

participated in six separate telephone calls using cellular telephone towers covering the area of the Dadeland Mall.

On May 18, 2009, investigating officers filed a criminal complaint in the district court supported by a probable cause affidavit of one of the investigators. The complaint alleged that Carter and Maxime had violated the Hobbs Act, 18 U.S.C. § 1951(a) – interference with interstate commerce by robbery – and had also violated 18 U.S.C. § 924 (c)(1)(A) by possessing a firearm in furtherance of a crime of violence resulting in the death of another person. After reviewing the complaint and supporting affidavit, a United States Magistrate Judge issued arrest warrants for Carter and Maxime.

At 6:00 a.m. on the morning of May 20, 2009, law enforcement officers arrived at the home of Carter's parents to effect Carter's arrest. Carter was living with his parents at that time together with his girlfriend, Erskaneshia Ritchie.[2] Carter was arrested at approximately 6:20 a.m. and gave his consent to a search of the house and his car.[3]

---

[2]It was determined during the investigation that Ritchie and her friend, Nikkia Thomas, had participated in the crime by serving as lookouts. See note 6, infra.

[3]The search resulted in the discovery of two firearms in the house, a firearm magazine in Carter's car, several types of ammunition, various items commonly used in the manufacture and sale of crack cocaine, and two baggies containing crack cocaine.

Carter was then transported to a county police building and placed in an interview room at 7:47 a.m. for initial processing. At 8:25 a.m. two investigating officers entered the room, removed Carter's handcuffs, and advised him of his Miranda rights. Carter voluntarily signed a Miranda waiver of rights form, and the officers began questioning him.[4] The interview was interrupted twice during the morning for breaks requested by Carter. At 11:40 a.m., after one of the breaks, Carter was shown a voluminous chart depicting all of the cellular telephone calls that had been made during December 1, 2008, by the four participants including their respective geographic locations at the time of the calls. At that point Carter began to cry and orally confessed to his guilt as the person who had shot and killed Alvarado. At 12:15 p.m. after his oral confession, the interrogating officers began reviewing with Carter the details of the crime and his participation in it. At 1:17 p.m. Carter asked for a break to eat,[5] and the interview was interrupted until 1:54 p.m. Carter then agreed to give a formal audio and videotaped statement under oath, and that was done after he was informed about, and once again waived, his Miranda rights. Later in the afternoon, the investigating officers took

---

[4]Initially, the officers' questions centered on Carter's history and background. During this phase of his interrogation Carter admitted that he supplemented his income by dealing narcotics.

[5]Food had been brought in and offered to Carter at noon, but he declined to eat at that time saying that he was not hungry.

5

Carter to the location he had described as the place he had disassembled and disposed of the murder weapon, and another location where he had burned the Dunbar fabric bag. Corroborating evidence was found at both locations. Carter was then taken before a United States Magistrate Judge for an initial appearance the next day.

A superseding indictment was later returned against Carter and Maxime containing six counts. Count One charged a conspiracy, and Count Two charged a substantive offense, to obstruct, delay and affect commerce by robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. Count Three charged a violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1) by using and carrying a firearm during and in relation to a crime of violence, and by murdering another person in the course of committing such offense. Those three counts were included in, and constituted the entirety of, the original indictment.[6] Counts Four, Five and Six were added by the superseding indictment and charged Carter alone with a conspiracy and a substantive offense, respectively, involving possession with intent to distribute

[6]The original indictment named Carter's girlfriend, Erskaneshia Ritchie and her friend Nikkia Thomas as codefendants with Carter and Maxime. Thomas pled guilty to one count of that indictment. Ritchie pled guilty to a superseding information. Both were then named as unindicted coconspirators in the superseding indictment against Carter and Maxime, and both Ritchie and Thomas testified for the government at Carter's trial. They described the planning of the robbery and their participation in the crime by providing vehicles and by acting as lookouts in the mall parking lot.

cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).[7]

At jury trial, Carter was convicted of all six counts of the superseding indictment.  At sentencing, the district court imposed maximum, consecutive sentences as to all counts resulting in an aggregate commitment term of life plus 105 years.

## II

A.    Denial of Motion to Suppress.  Carter moved to suppress his confession and the physical evidence seized following his arrest.  Acting on a report and recommendation of a Magistrate Judge, the district court denied the motion and Carter's confession, including the videotaped statement made during the afternoon of the day of his arrest, was admitted during the trial.  Carter claims that this was error and he presents on appeal the same issues he argued in support

---

[7]The district court granted a motion for severance of the Defendants and Carter and Maxime received separate trials.  This appeal involves only the Defendant Carter.  Carter also moved to sever the Hobbs Act counts (Counts One, Two and Three) from the drug counts (Counts Four, Five and Six), but that motion was denied.  See infra, Part II B.

of the motion to suppress in the district court,[8] only one of which requires

discussion.[9]

Carter asserts that there was unreasonable delay in producing him before a

judicial officer in violation of Federal Rule of Criminal Procedure 5(a) and 18

U.S.C. § 3501(c), and that his confessions should have been suppressed because

they were made during a period of illegal detention resulting from that

unreasonable delay. In the context of the facts of this case, this argument has two

aspects. The first involves the admissibility of Carter's oral confession made

before noon, within six hours after his arrest; and the second involves the

admissibility of the audio-video, transcribed repetition of his confession given

during the afternoon, more than six hours following his arrest.

The current state of the law governing these issues has evolved from the

Supreme Court's decision in McNabb v. United States, 318 U. S. 332, 63 S. Ct.

---

[8]Carter contends that there was no probable cause for his arrest; that his waiver of his Miranda rights was involuntary; that the district court erred in striking his objections to the report and recommendation of the Magistrate Judge; and that the district court erred in denying a Franks hearing (Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978)). We find no merit in any of these claims.

[9]A determination of probable cause is reviewed de novo on appeal. United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997). In reviewing the denial of a motion to suppress we apply a "clearly erroneous" standard to fact findings and review de novo the district court's conclusions of law. United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir. 2005)

8

608 (1943).  The McNabb defendants were arrested by federal officers between one and two o'clock on a Thursday morning.  They were then subject to intense interrogation, off and on, for 48 hours until they had made complete confessions about two o'clock Saturday morning.  Only then were they placed on track for an appearance before a judicial officer.  Exercising its supervisory authority over federal courts without establishing a constitutional requirement or any general rule of thumb concerning the permissible length of post arrest interrogations, the Supreme Court held that the confessions in the case before it should have been suppressed, saying only "that a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here."  318 U.S. at 347, 63 S. Ct. at 616.

Less than a year after McNabb the Supreme Court decided United States v. Mitchell, 322 U.S. 65, 64 S. Ct. 896 (1944).  The court of appeals in Mitchell, relying upon McNabb, had excluded a confession made immediately after the defendant's arrest because the defendant was then detained for another eight days before being presented to a magistrate.  The Supreme Court reversed, explaining that McNabb had been mis-applied.  Mitchell's confession, otherwise voluntary, was not made during a period of unreasonable delay and illegal detention as in

9

McNabb, and his confession was held to have been properly admitted at his trial. The extended detention after his confession was simply not relevant to the admission of the confession given before the detention became tainted.  322 U.S. at 69-71, 64 S. Ct. at 897-98.

In the wake of McNabb and Mitchell, Rule 5(a) of the Federal Rules of Criminal Procedure was promulgated in 1946 requiring, as it still does today, that anyone making a federal arrest must take the arrested person before a judicial officer "without unnecessary delay."

Two years later the Supreme Court decided Upshaw v. United States, 335 U.S. 410, 69 S. Ct. 170 (1948).  The trial court had admitted a confession made by the defendant during a detention of thirty hours preceding his appearance before a judicial officer.  The trial judge found the delay to be reasonable because of the absence of overt coercion and the resulting voluntariness of the confession.  The Supreme Court reversed, applied  McNabb and Rule 5(a), and held that prolonged delay in producing an arrestee before a judge renders the detention illegal so that any resulting confession is inadmissible even though it was otherwise voluntarily made.  335 U.S. at 412-14, 69 S. Ct. at 171-72.

The Supreme Court next decided Mallory v. United States, 354 U.S. 449, 77 S. Ct. 1356 (1957).  The defendant had been arrested between 2:00 and 2:30 in the

10

afternoon.  He was taken to police headquarters and was subject to intermittent interrogation over a period of eight hours before confessing at 10:00 p.m.  He was then produced before a judicial officer the following morning.  The trial court admitted the confession at trial and the court of appeals affirmed, finding the delay to be reasonable because Mallory was not being questioned during the entire eight hour period.  Rather, during portions of that time the officers were questioning two other suspects in order to sort out the individual involvement of the three persons, including Mallory, who were the subjects of the investigation.  See Mallory v. United States, 236 F.2d 701, 703 (D. C. Cir. 1956).  The Supreme Court again applied McNabb and reversed, finding that the delay in presentment was unreasonable under Rule 5(a) and that the confession should have been excluded. 354 U.S. at 453-456, 77 S. Ct. at 1359-60.

In 1968 Congress enacted 18 U.S.C. § 3501(c) as a legislative response to the McNabb - Mallory, rule and the imprecise "without unnecessary delay" standard of Rule 5(a).  The statute – § 3501(c) – provides that a post arrest confession ". . . shall not be inadmissible solely because of delay in bringing such person before a magistrate . . . [1] if such confession is found by the trial judge to have been made voluntarily and [2] if the weight to be given the confession is left

11

to the jury and [3] if such confession was made . . . within six hours immediately following his arrest. . ."

The six hour rule-of-measure in § 3501(c) is, obviously, a two edged sword. It provides, on the one hand, a safe harbor period for non-coercive questioning during the first six hours of detention; but, on the other hand, it also establishes a precise limitation on the permissible length of post arrest interrogation before an initial appearance. With respect to the latter effect, Congress appended a proviso to the statute that "the time limitation [of six hours] shall not apply in any case in which the delay . . . beyond such six hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available [magistrate]."

The Supreme Court most recently considered the effect of § 3501(c) upon the McNabb-Mallory rule in Corley v. United States, 556 U.S. 303, 129 S. Ct.

1558 (2009).[10]  The Court summarized its holding and succinctly stated the present

state of the law this way:

> We hold that § 3501 modified McNabb-Mallory without
> supplanting it.  Under the rule as revised by § 3501(c), a
> district court with a suppression claim must find whether
> the defendant confessed within six hours of arrest (unless
> a longer delay was "reasonable considering the means of
> transportation and the distance to be traveled to the
> nearest available [magistrate judge]").  If the confession
> came within that period, it is admissible, subject to the
> other Rules of Evidence, so long as it was "made
> voluntarily and . . . the weight to be given [it] is left to
> the jury."  Ibid.  If the confession occurred before
> presentment and beyond six hours, however, the court
> must decide whether delaying that long was
> unreasonable or unnecessary under the McNabb-Mallory
> cases, and if it was, the confession is to be suppressed.

556 U.S. at 322, 129 S. Ct. at 1571.

---

[10]The salient facts of Corley were these.  Corley was arrested at 8:00 a.m.  From the time of arrest to 11:45 a.m. he was kept in the police station while investigators questioned other witnesses.  At 11:45 he was taken to a hospital for treatment of a minor cut on his hand sustained during a chase at the time of his arrest.  At 3:30 p.m. he was returned to the FBI office and was questioned.  He began confessing at 5:27 p.m., some 9 ½ hours after his arrest.  An hour later, when asked to put it in writing, Corley requested a break.  He was then kept overnight and finished his written confession the next morning before being taken before a Magistrate Judge at 1:30 p.m., 29 ½ hours after his arrest.  See 556 U.S. at 311-312, 129 S. Ct. at 1565.  The district court excluded the time spent at the hospital in applying the six-hour safe harbor rule and admitted the confession as having been made within six hours following arrest.  The court of appeals affirmed but on the basis that § 3501 had abrogated McNabb-Mallory.  Ultimately, the Supreme Court vacated and remanded for reconsideration of the case by the court of appeals (including consideration of the district court's rationale) in light of the Court's holding quoted in the text.  556 U.S. at 323, 129 S. Ct. at 1571.

Applying the holding in Corley – which embraces both Rule 5(a) and §

3501(c) – the conclusion is inescapable that Carter's oral confession made before

12:15 p.m. on the day of his arrest at 6:20 a.m. was within the six hour safe harbor

provision of the statute.  The record also supports the finding of the district court

that the confession was voluntary in every respect and was accompanied by full

compliance with Miranda.  There was no error in admitting evidence of that

confession.  United States v. Mitchell, 322 U.S. 65, 64 S. Ct. 896 (1944).

That conclusion reduces the scope of the motion to suppress to the

admissibility of the audio/video recording and printed transcript that was made

during the afternoon, more than six hours after Carter's arrest.  The Magistrate

Judge and the district court found that evidence of the confession in that form[11]

was admissible because the delay in presenting Carter before a judicial officer was

not unreasonable or unnecessary.  Two factors were mentioned in support of that

conclusion.  First, the Magistrate Judge found that by the time of the Defendant's

---

[11]The Magistrate Judge and the district court found that "[t]he audio and videotaped statements were not based on new questioning, but were a memorialization of the Defendant's prior confession."  One might well conclude that this finding alone brings the analysis under Rule 5(a) and § 3501(c) to an end.  It is the confession that constitutes the evidence.  The form in which it is admitted – through the oral testimony of the interrogator, or a writing made or signed by the defendant, or an audio or video recording, or a printed transcript – is wholly immaterial absent something else (not including the tactical preference of counsel) that would warrant exclusion of one form and not the other under Fed. R. Evid. 403.  However, in the apparent absence of any prior authority recognizing this point as a matter of law, we find it unnecessary to decide this case on that basis.

14

confession at noon, it was already too late to deliver the defendant to the Marshal for production at the Magistrate Judges' 1:30 p.m. duty calendar on that day. Also, as part of his confession, Carter described two geographic locations, one where he had discarded the murder weapon, and another where he had burned the Dunbar bag and other tangible evidence. The district court thought it was reasonable – and we agree – for the officer to attempt with Carter's assistance to locate the weapon, in particular, not only to collect and preserve evidence, but to eliminate a potential danger to the public.

We conclude that there was no error under McNabb-Mallory, Rule 5(a) or § 3501(c), in the admission of Carter's confession in the form in which it was given during the afternoon of the day of his arrest. Furthermore, on the facts of this case, if there was error, we have no hesitancy in declaring it to be harmless beyond a reasonable doubt. See United States v. Ragland, 434 Fed. Appx. 863, 869 (11th Cir. 2011). All of the evidence in this case, fortified by Carter's clearly admissible forenoon confession, was more than overwhelming, it was conclusive.

B.    Denial of Motion to Sever Counts.  Carter moved to sever Counts Four, Five, and Six of the superseding indictment – the cocaine offenses and the firearms charge associated with those offenses – so that he would be tried first

with respect to the Hobbs Act and firearms offenses alleged in Counts One through Three, standing alone.

His argument in the district court, repeated here on appeal, is that the two groups of counts were not sufficiently "connected" as required for joinder under Federal Rule of Criminal Procedure 8(a), and that he was prejudiced because he would have testified at a separate trial with respect to the drug charges. We are not persuaded.[12]

The two groups of counts were connected in this case by evidence including Carter's own admissions, supported by Ritchie's testimony, that he used a portion of the proceeds of the robbery to purchase cocaine which he converted to "crack" for sale on the street. There was, therefore, not only a transactional relationship between the two groups of offenses, that relationship also served as relevant evidence of Carter's motive for planning and carrying out the robbery. With respect to the firearm count associated with the two drug counts, the search incident to Carter's arrest led to the discovery of firearms in the area of a quantity of cocaine and cocaine paraphernalia; and Ritchie testified that Carter kept a

---

[12]Whether the district court was justified in denying a motion to sever counts of an indictment is reviewed for abuse of discretion. United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993).

16

firearm between the front seats of his car whenever he drove to the area of his drug dealing.[13]

We conclude that the district court did not abuse its discretion in finding that all of the counts of the superseding indictment were sufficiently "connected" for purposes of joinder under Rule 8(a).

Furthermore, a severance is not required simply because a defendant declares that he wishes to testify concerning some counts but not others. United States v. Hersh, 297 F.3d 1233, 1243 n. 15 (11th Cir. 2002). "[T]o establish that the joinder of charges kept him from testifying, [a defendant] must show that the charges were distinct in time, place, and evidence, that there was 'important' evidence that he might have offered on one set of charges but could not, and that he had a 'strong need' not to testify on the other counts." Id. (citing United States v. Gardiner, 955 F.2d 1492, 1497 (11th Cir. 1992)). That showing has not been made in this case.

## III

A. Asserted Errors During Trial. Carter claims that the district court committed several errors during trial.

---

[13]This testimony and evidence also requires rejection of Carter's claim on appeal that there was insufficient evidence to support his conviction (of Count Six) for knowingly possessing a firearm in furtherance of a drug transaction in violation of 18 U.S.C. § 924(c)(1)(A).

17

1.    During voir dire of the jury panel, while the judge was explaining the presumption of innocence and the burden of proof in criminal cases, a prospective juror raised his hand.  This is the colloquy that followed:

| | |
|---|---|
| The Court: | Yes, sir.  What's the problem?  Wait.  Let me get [a microphone] - - - tell us your name? |
| | * * * * |
| Prospective Juror: | [states his name] |
| The Court: | All right Mr. [name of prospective juror].  What's the problem? |
| Prospective Juror: | I work in an office building that is like a stone's throw from this.  I remember this vividly the day it happened. |
| The Court: | Okay.  And you feel that your experiences at that time would make it impossible for you to be fair and impartial? |
| Prospective Juror: | Well, when you asked if I knew anything of the people, no, but I do recognize - - |
| The Court: | Okay.  You know I don't want you to say more because I don't want to, you know, taint any of the other people. |
| Prospective Juror: | Of course. |
| The Court: | You are excused.  Any objection from either side? |

18

No objection was stated concerning the excusal of the prospective juror, but Carter's counsel subsequently moved out of the presence of the venire to strike the jury panel in its entirety stating that the prospective juror had gestured toward Carter at the time the court interrupted and cut off the prospective juror's statement. The Judge denied the motion saying that "I don't think his gesture was that clear or that unequivocal," and the prosecutor added that "I think he was waving in general."

"We review the district court's determination whether to strike an entire jury panel for manifest abuse of discretion." United States v. Trujillo, 146 F.3d 838, 842 (11th Cir. 1998) (citing United States v. Simmons, 961 F.2d 183, 184 (11th Cir. 1992) and United States v. Muller, 698 F.2d 442, 444 (11th Cir. 1983)). We have also said that "it is generally proper for a reviewing court, which must rely on a cold record, to defer to the conclusions reached by the trial judge on this issue [involving assessment of bias during jury selection]." Depree v. Thomas, 946 F.2d 784, 790 n. 12 (11th Cir. 1991). We do not perceive any abuse of discretion in this case. It would be entirely speculative to conclude on this record that anyone on the jury panel either was, or might have been, impelled to bias against the defendant by the prospective juror's statement accompanied by an indefinite gesture.

19

2.      The case agent was called as a witness by the United States to facilitate publication to the jury of the videotapes taken from the Dadeland Mall's surveillance cameras depicting scenes in the area of The Express store on December 1, 2008.  During the course of his direct examination he was asked who the person was in the video then being displayed to the jury.  He responded "Emmanuel Maxime."  Defense counsel objected on grounds of improper predicate, and the judge himself asked the witness how he identified the subject as Maxime.  The witness answered: "He confessed to being that person."  Carter's counsel moved for a mistrial which the district court denied.[14]  The answer of the witness was probably not excludable hearsay,[15] but that does not matter because it <u>was</u> an infringement of Carter's Sixth Amendment right of confrontation under <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004).  Nevertheless, it was also an entirely innocuous event.  There is no suggestion of improper motive or wrongful conduct by the prosecution or by the witness.  The infringing answer

---

[14]The district court offered to give a limiting instruction to the jury but defense counsel elected not to request it "because the bell has already rung. . . ."

[15]Federal Rule of Evidence 804(b)(3) creates an exception to the exclusion of a hearsay declaration that constitutes a statement against interest (by an unavailable witness) defined as a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to civil or criminal liability; and is supported by corroborating circumstances that clearly indicate its trustworthiness. . . ."

was entirely responsive to a question from the court itself, not the prosecution; and the court's question, in turn, was a reasonable and natural consequence of the objection made by defense counsel – no proper predicate, *i.e.*, a challenge to the basis of the knowledge of the witness concerning his answer to the previous question.  Additionally, the reference to an admission by Maxime that he was the person shown in the surveillance film was not <u>directly</u> inculpatory of Carter, and the six word answer in an extended trial given under the circumstances just described, was not a noteworthy incident.  Carter's own confession identified Maxime as his accomplice, corroborated by the testimony of Ritchie and Thomas, and by the evidence of the cell phone records.

We have previously found an infringement of the confrontation clause to be subject to harmless error analysis, <u>see</u> <u>United States v. Mills</u>, 138 F.3d 928, 939-941 (11th Cir. 1998), and we reach the same conclusion in this case.  No reasonable jury would have found Carter not guilty absent this incident, and the negligible Sixth Amendment injury was harmless beyond a reasonable doubt.

3.       Carter complains that an error in the district court's final instructions to the jury concerning Count Six of the superseding indictment requires reversal. There was, however no contemporaneous objection to the challenged portion of the court's jury charge as required by Federal Rule of Criminal Procedure 30(d),

21

and no resulting opportunity for the district court to note and correct the error.

Under those circumstances, we conduct a plain error review under Federal Rule of

Criminal Procedure 52(b) and United States v. Olano, 507 U.S. 725, 113 S. Ct.

1770 (1993).

Count Six alleged that the defendant knowingly possessed a firearm in

furtherance of a drug trafficking crime "as set forth in Count 4 and Count 5 of this

Superseding Indictment" in violation of 18 U.S.C. § 924(c)(1)(A).  In its charge to

the jury, a printed copy of which was given to the jury, the district court

mistakenly said at one point that Count Six required proof that "the defendant

committed the crime of violence charged in Count I or Count II of the indictment,"

rather than saying, correctly, that Count Six required proof of the drug trafficking

offenses charged in Count Four and Count Five.  That error was arguably

corrected shortly thereafter, however, when the court said to the Jury:

> The indictment charges the defendant knowingly carried
> a firearm during and in relation to a drug trafficking
> crime and that the defendant possessed the firearm in
> furtherance of a drug trafficking crime.  In other words,
> the defendant is charged with violating the law in Count
> 6 in two separate ways.  The government has to prove
> only one of those ways, not both.  But to find the
> defendant guilty, you must all agree on which of the two
> ways the defendant violated the law. (Emphasis
> supplied)

22

Additionally, the superseding indictment itself, a copy of which was given to the jury for reference during deliberations, clearly stated that Count Six was tied to Counts Four and Five, not Counts One and Two; and the prosecutor in his closing argument made it clear that the firearms charge in Count Six was dependent upon Counts Four and Five, not Counts One and Two.  His argument to the jury was:

> So I've talked about the first three counts of the indictment.  I want to spend a little time talking about count IV, V and VI, the drug trafficking.  And the evidence in this case also establishes beyond a reasonable doubt that Dwight Carter was trafficking narcotics.
>
> * * * *
>
> In addition to those counts, Dwight Carter is also charge [sic] with possessing a firearm in furtherance of a drug trafficking crime.  And you can find that he did that by finding first, that he committed the drug trafficking crimes charged in Count IV and V of the indictment.  But in addition to that, you must find that Carter possessed that firearm in furtherance of the drug trafficking.

Our cases in this circuit are clear and consistent regarding plain error review under Rule 52(b) and Olano, supra.  To correct a forfeited but reversible error, there must first be error; the error must be plain; and the plain error must affect substantial rights.  E.g., United States v. Hansley, 54 F.3d 709 (11th Cir. 1995); United States v. Thayer, 204 F.3d 1352 (11th Cir. 2000); United States v. Bendek,

23

146 F.3d 1326 (11th Cir. 1998).  Here, there was clearly an error in the district court's jury instructions, and we will assume that it was plain in the sense that the mistake was palpably contrary to clearly established law requiring legally accurate jury instructions concerning the essential elements of the offense.  We will further assume that the error affected a substantial right, namely, the same principle of law that the accused has a fundamental right to have the jury accurately instructed about the essential elements of the offense.  United States v. Miller, 22 F.3d 1075, 1079 (11th Cir. 1994) (citing United States v. Fitzpatrick, 581 F.2d 1221, 1223 (5th Cir. 1978) and Bearden v. United States, 320 F.2d 99, 103 (5th Cir. 1963)).  But that does not end the inquiry.  As we noted in United States v. Bendek, supra:

> The rule permits an appellate court to correct a forfeited-but-reversible error.  There are several limitations placed on appellate authority under such circumstances.  There must be error; the error must be plain; and the plain error must affect substantial rights.  Olano, 507 U. S. at 732-34, 113 S. Ct. at 1777-78.  There is a further limitation, however.  A court of appeals may correct a plain, forfeited error affecting substantial rights only 'if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.''  Id. at 736, 113 S. Ct at 1779 (quoting United States v. Atkinson, 297 U. S. 157, 160, 56 S. Ct. 391, 392, 80 L.Ed. 555 (1936)).  Accordingly, a plain error affecting substantial rights does not, without more, satisfy this standard.  Id. at 737, 113 S.Ct at 1779.

146 F.3d at 1328 - 1329.

24

We conclude in this instance that the plain error complained of did not seriously affect the fairness, integrity or public reputation of the judicial proceedings.  There is nothing to suggest that the jury was in fact confused or misled in its consideration of Count Six of the superseding indictment, and the evidence was abundant in support of the jury's verdict.  No manifest injustice will result from honoring that verdict, and we decline to upset it.[16]

**IV**

A.    Asserted Errors in Sentencing.

1.    Carter claims that error was committed in the district court's oral pronouncement of sentence.  The record reflects that there was, indeed, some initial confusion during the sentencing hearing concerning the court's intended sentence as orally announced.  The record also reflects, however, that the district court promptly clarified and restated the sentence, and that the written judgment

---

[16]Carter also assigned as trial errors a failure to dismiss the Hobbs Act counts due to insufficiency of the evidence of an affect on interstate commerce; an incident involving interaction of Court personnel with the jury during the deliberations; the lack of limiting instructions with respect to the admission of certain testimony; and a limitation of the cross examination of Ritchie as a witness.  We find no abuse of discretion by the district court and no merit in any of these claims of error when considered singularly or cumulatively, and none require further discussion.

entered after the sentencing hearing corresponds precisely to the clarified oral sentence.[17]  There was no error in these events.

2.     Carter claims that error was committed during the sentencing hearing because the judge did not address him personally for the purpose of inviting individual allocution as required by Federal Rule of Criminal Procedure 32(i)(4)(A)(ii).[18]  See United Sates v.Prouty, 303 F.3d 1249 (11th Cir. 2002).

In Prouty we held that a failure by the district court to personally address the defendant at sentencing constituted plain error affecting a substantial right, and that, where the defendant could have received a lesser sentence, the violation impacted the fairness of the proceeding resulting in a manifest injustice requiring reversal.  303 F.3d at 1251-53.

Unlike Prouty, in which there was no dispute that the sentencing judge utterly failed to address any remark to the defendant, the record in this case depicts a different series of events.

---

[17]The sentences the district court orally imposed and subsequently stated in the judgment were the maximum sentences permitted by the governing statutes: consecutive terms of 20 years as to each of Counts One, Two, Four and Five (aggregating 80 years); a consecutive term of life imprisonment as to Count Three; and a consecutive term of 25 years as to Count Six, aggregating in all a term of life plus 105 years.

[18]The rule provides that, before imposing sentence, the court must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence."  Fed. R. Crim. P. 32(i)(4)(A)(ii).

26

At the sentencing hearing (a joint hearing at which the court sentenced both Carter and Maxime), the judge first recognized the lawyers and heard from both the prosecutor and defense counsel at length with respect to the sentencing of each of the defendants.  When counsel for Carter finished his remarks, the following occurred:

| | |
|---|---|
| The Court: | Anything further from you <u>and or the defendant</u>? |
| Defense Counsel: | No, sir. |

At that point the prosecutor asked to reply and addressed the court for several minutes.  At the end of his remarks this occurred:

| | |
|---|---|
| The Court: | Anything further <u>from either defendant</u> and/or counsel? |
| Defense Counsel: | Just briefly, Your Honor.  And I do apologize. |

At the end of counsel's statement the judge orally announced Carter's sentence after which the judge said:

| | |
|---|---|
| The Court: | Now that sentence has been imposed, <u>does the defendant</u> or his counsel object to the Court's finding of fact as to the manner in which sentence was pronounced? |
| Defense Counsel: | The objections I previously raised. |

27

This is an instance, once again, in which we are somewhat hampered by a cold record. We cannot see the judge at the moment he made his remarks that were ostensibly addressed to the defendant as well as counsel. We cannot see what gestures the judge may have made or whether eye contact was established with the defendant. Obviously, explicit reference to the defendant by name in inviting allocution would be a far better practice, but the rule does not require that, and we construe the statements made by the sentencing judge to have been addressed to the defendant personally in compliance with what the rule does require. This conclusion is supported by at least three things. First, the words used by the judge – three separate times – referring to the defendant or his counsel can only be interpreted as a communication directed to both, not just to counsel alone. Secondly, the words themselves suggest an awareness on the part of the judge of the need to address the defendant personally, and they reflect his effort to do so; and third, the record shows that no less than five lawyers were present participating in the hearing as officers of the court. It seems reasonable to infer that the well known requirement of the rule was met because not one of those lawyers alerted the court to the contrary despite being invited by the judge to speak up if there was more that needed to be done. We find no violation of Rule 32(i)(4)(A)(ii).

28

Having found no reversible error in the defendant's convictions or sentences the judgment of commitment is AFFIRMED in all respects.