TJOFLAT, Circuit Judge, dissenting:
To convict Matthew Munksgard of violating 18 U.S.C. § 1014, the government had to prove that Drummond Community Bank (the "Bank") was FDIC-insured when Munksgard committed the offense in 2013 and 2014. Although proving that fact should be "simple and straightforward," United States v. Maner , 611 F.2d 107, 112 (5th Cir. 1980),[1] the government consistently has trouble with it. Add this case to the list. Here, there was no direct evidence that the Bank was insured in either 2013 or 2014-no documentary evidence, witness testimony, or otherwise.
Instead, the government presented three pieces of circumstantial evidence. First, it introduced a certificate that shows the Bank's deposits were insured in 1990, twenty-three years before the crime. Next, it presented testimony from a Bank employee who said that the Bank was currently FDIC-insured (in 2016), a couple years after the crime. And finally, the government presented testimony from the same Bank employee who said the Bank isn't required to renew its FDIC certificate "every so often." Majority Op. at 1330-31. That's it.
The majority holds that this evidence is "good enough" to allow a reasonable jury to find-beyond a reasonable doubt-that the Bank was FDIC-insured in 2013 and 2014. Majority Op. at 1332-33. But the majority is not writing on a blank slate. It relies on our precedent, stretching back to the former Fifth Circuit, to draw the line between what's sufficient and what's not. Majority Op. at 1333 ("In any event, given our precedent , what the government presented here was good enough." (emphasis added) ). Because I believe the majority misreads this precedent, and in doing so, violates Munksgard's constitutional rights, I respectfully dissent.
I divide my discussion into four parts. First, I explain that no binding precedent in this Circuit compels the conclusion the majority reaches. Second, putting the issue of binding precedent aside, I show that the majority's analysis, and its reliance on an evidentiary inference, is unpersuasive. Third, I point out that the Bank employee's testimony about renewal is not additional evidence of insured status. Fourth, I highlight that a misreading of Cook v. United States , 320 F.2d 258 (5th Cir. 1963), has caused courts, including the majority, to apply an unconstitutional presumption of insured status in these cases.
*1337 I.
The majority correctly points out that the problem in this case-whether the government presented enough evidence to allow a reasonable jury to find beyond a reasonable doubt that a bank was FDIC-insured at the time of the crime-stretches back more than half a century, in this Circuit alone. Despite this long history, the majority dives into our precedent with United States v. Fitzpatrick , 581 F.2d 1221 (5th Cir. 1978) (per curiam).
Tellingly, the majority begins its discussion of our precedent by quoting dicta. The majority writes that in Fitzpatrick this Court "observed that 'a jury can reasonably infer that an institution was federally insured on the date of a robbery if it is presented with evidence showing that the institution was insured both prior to that date and recently thereafter.' " Majority Op. at 1331 (quoting Fitzpatrick , 581 F.2d at 1223 ). As the majority concedes, that statement is nothing more than an observation, and an unpersuasive one at that.
In Fitzpatrick , the defendant was charged with robbing a bank that was FDIC-insured. 581 F.2d at 1222. The District Court did not instruct the jury that the government must prove the bank's deposits were FDIC-insured; the District Court mistakenly instructed the jury using a different jurisdictional hook. See id. at 1223. On appeal, the Court considered whether that instructional mistake was reversible error and held that it was. Id. Before reaching its holding, the Court said that "a jury can reasonably infer that an institution was federally insured on the date of a robbery if it is presented with evidence showing that the institution was insured both prior to that date and recently thereafter." Id. But this statement is pure dictum; it is unnecessary to the Court's holding that the conviction must be reversed. See In re BFW Liquidation, LLC , 899 F.3d 1178, 1186 (11th Cir. 2018) ("If a statement is 'not necessary to the result the Court reached in the case,' then that statement is dictum." (quoting United States v. Hunter , 172 F.3d 1307, 1310 (11th Cir. 1999) (Ed Carnes, J., concurring) ) ). The Court made clear that the statement is dictum because it noted the government proved guilt beyond a reasonable doubt (which means the government proved insured status), but it still reversed the conviction. See Fitzpatrick , 581 F.2d at 1223-24. As dictum, the statement "is not binding on anyone for any purpose." BFW Liquidation , 899 F.3d at 1186 (quoting Edwards v. Prime, Inc. , 602 F.3d 1276, 1298 (11th Cir. 2010) ).
If any case in this Circuit actually held what the Court said in Fitzpatrick , the majority surely would have started there. But no case holds that a jury may infer insured status based on prior and subsequent status.
Backtracking a bit, the parties agree that the Circuit's law on this problem begins with Cook v. United States , 320 F.2d 258 (5th Cir. 1963). Indeed, the majority eventually cites Cook and mimics its analysis. But Cook helps the majority no more than Fitzpatrick .
In Cook , the defendant was convicted of robbing an FDIC-insured bank. 320 F.2d at 259. To prove that the bank was insured at the time of the robbery, the government called the bank's vice president. Id. The vice president testified that the bank's deposits were covered by the FDIC. Id. That's it; the vice president said nothing about whether the bank was insured when it was robbed. Importantly, the defendant never objected, never filed a motion for judgment of acquittal, and never filed a motion for a new trial. Id. Thus, on appeal, the Court reviewed-under the plain error standard-whether the government presented enough evidence to prove that the bank was FDIC-insured when it was robbed. Id.
*1338 To answer the evidentiary question, the Court relied on what it called an evidentiary "rule" (really, though, the rule is just a logical inference): "When the existence of an object, condition, quality, or tendency at a given time is in issue, the prior existence of it is in human experience some indication of its probable persistence or continuance at a later period." See id. (quoting 2 John H. Wigmore, Wigmore on Evidence 413, § 437). Similarly, evidence of "subsequent existence" can be some indication of earlier existence. See id. I call this Wigmore's inference.
Applying Wigmore's inference, if a bank was FDIC-insured at some point before the crime was committed, it's more likely that the bank was also FDIC-insured later, when the crime was committed. Id. Similarly, if a bank was FDIC-insured at some point after the crime was committed, it's more likely that the bank was also FDIC-insured earlier, when the crime was committed. Id.
Below, I explain why this type of inference is inappropriate to prove FDIC-insured status. But first, I explain exactly how the Court in Cook used this inference-which depended heavily on the plain error standard of review-because Cook 's use of it is fatal to the majority's analysis.
The Court in Cook did not apply Wigmore's inference in a vacuum; it applied the inference in the context of plain error review. The Court explained "that the common knowledge of the nearly universal prevalence of the banks of the United States having their deposits insured by the Federal Deposit Insurance Corporation permits, if it does no[t] require, an inference under the rule stated by Wigmore that the [relevant] bank was insured at the time it was [robbed]." Id. at 259-60. But why was the Court looking outside the judicial proceedings to the "nearly universal prevalence" of FDIC-insured banks? After all, the bank's insured status at the time of the crime is a fact that must always be found-beyond a reasonable doubt-by the jury. And, of course, the jury can't rely on "nearly universal prevalence" to make the inference that Cook endorsed. There's nothing in the jury instructions about that.
The standard of review answers the question: the Court was looking outside the judicial proceedings because it was required to do so under plain error review.[2] The fourth factor of plain error review *1339 asks whether the error-here, insufficient evidence on a jury-found fact in a criminal case-"seriously affected the fairness, integrity, or public reputation of judicial proceedings." United States v. Hernandez , 906 F.3d 1367, 1370 (11th Cir. 2018) (emphasis added) (quoting Rodriguez , 398 F.3d at 1298 ). The purpose of the fourth element is to analyze whether a "reasonable citizen would[ ] bear a rightly diminished view of the judicial process and its integrity if" the court refused to correct the alleged error. See Rosales-Mireles v. United States , --- U.S. ----, 138 S.Ct. 1897, 1908, 201 L.Ed.2d 376 (2018) (quoting United States v. Sabillon-Umana , 772 F.3d 1328, 1333 (10th Cir. 2014) ). It's about institutional legitimacy.
Here's the upshot. The court in Cook highlighted the "universal prevalence" of insured status to show why, assuming the District Court erred, the error would not affect the integrity of the judiciary. The error was not egregious-and a reasonable citizen wouldn't think any less of the judiciary-because the "universal prevalence" of insured status was "common knowledge" among reasonable citizens. That is, even if the government's evidence of insured status was a little thin, the error was not the type of egregious error that would cause reasonable citizens to question the judiciary's ability to do its job.
Simply put, Cook does not stand for the proposition that evidence of prior insured status and evidence of later insured status is enough to uphold a criminal conviction when a criminal defendant appeals the denial of his motion for acquittal. Nor does it say there is no error when the government uses evidence of prior and later insured status to prove insured status at some point in the middle. Cook stands for the proposition that, in some circumstances, a conviction based on evidence of prior insured status and later insured status need not be overturned on plain error review .
When Cook is read in its proper context, it clearly cannot support the weight the majority gives it. Indeed, the majority uses Cook as the bedrock of its analysis. It uses Cook , which relied on Wigmore's inference, to support its conclusion that prior insured status plus later insured status reasonably equals insured status at some point in the middle.
Although Cook provides no precedential support for the majority's analysis, its use of Wigmore's inference could still provide a persuasive analytical framework. A quick analysis of the inference shows it does not.
II.
As additional support for Wigmore's inference, the Court in Cook cited F.W. Woolworth Co. v. Seckinger , 125 F.2d 97 (5th Cir. 1942). Cook , 320 F.2d at 259. Woolworth , which also applied Wigmore's inference, shows why the inference is inappropriate to prove FDIC-insured status.
The plaintiff in Woolworth fell while shopping at the defendant's store. 125 F.2d at 97. She sued, alleging the store's defective condition-the result of "wear and decay"-caused her fall. Id. at 97, 98. At trial, a witness who had seen the floor testified about its condition. Id. at 97-98. But the witness saw the floor forty-five days after the accident. Id. Thus, one of the issues on appeal was whether this witness's testimony was admissible. Id. at 97.
The Court, applying Wigmore's inference,[3] concluded that testimony about the floor's condition forty-five days after the accident was "evidential of its earlier condition." Id. at 98. The Court noted that *1340 "[w]here the condition is of such character that a brief lapse of time would not affect it materially , the subsequent existence of the condition may give rise to an inference that it previously existed." Id. (emphasis added). With nothing but ordinary wear and tear to change the floor's condition, the Court concluded that the floor's condition would not materially change in forty-five days. See id.
Wigmore's inference, though sensical in a civil case like Woolworth , makes little sense here. The condition at issue in Woolworth was the defective condition of the floor. The defective floor was not something that would materially change in a short period of time because (1) it became defective over a long period of time, due to ordinary wear and tear, and (2) the only thing that could change the defective condition was more wear and tear, which takes a lot of time. By contrast, the condition at issue here is the Bank's insured status, and insured status can materially change in a short period of time. See United States v. Stuart-Caballero , 686 F.2d 890, 893 (11th Cir. 1982) ("Continued FDIC insurance coverage, however, depends on periodic payment of premiums.") For example, insured status could change at least four times a year, every time a premium payment is due.[4] So, from 1990 to 2013, there were around ninety-two chances for the Bank's insured status to change. And from 2014 to 2016, there were eight more chances. The point is that evidence of prior and later insured status has little probative value because there were tons of chances for the Bank to lose its insured status.[5]
Because Wigmore's inference makes little sense in a case like this, Cook fails to provide a persuasive analytical framework for the majority to use. Although the majority's analysis leans heavily on Cook , it doesn't rely exclusively on Cook .
III.
In addition to showing "prior existence" and "subsequent existence" of FDIC-insured status, the majority also relies on the Bank employee's testimony that the Bank isn't required to renew its FDIC certificate "every so often." A reasonable jury, according to the majority, "could conclude that [t]his testimony provides additional evidence-beyond mere prior and subsequent existence-that [the Bank] was insured in 2013 and 2014." Majority Op. at 1333.
Two quick points. First, the Bank's employee did not say that the FDIC certificate is never renewed. In response to the question "[d]o you know whether or not this certificate is renewed," he answered "[i]t's not." Second, the employee said nothing about whether the FDIC insurance itself must be renewed. The FDIC certificate only shows that the Bank got FDIC-insured status in 1990. It doesn't *1341 show whether the Bank has done everything it needs to do to keep insured status, such as pay its premiums. This is surely why the government had a conviction vacated in a case where it presented only a certificate of FDIC insurance that was dated seven years before the offense. See United States v. Platenburg , 657 F.2d 797, 800 (5th Cir. 1981).[6]
Thus, I do not see how the Bank employee's testimony makes it more likely that the Bank was FDIC-insured in 2013 and 2014.
At this point, I've covered all of the majority's analysis that relates to evidence introduced at trial. Finally, I address the presumption-a presumption the majority applied against a criminal defendant.
IV.
According to the majority, "Coupled with the 'universal presumption ... that all banks are federally insured'-and viewing the proof in the light most favorable to the government-we conclude that a reasonable juror could find that [the Bank] was insured by the FDIC on the dates of Munksgard's offenses." Majority Op. at 1333 (first alteration in original) (internal citation omitted) (quoting Maner , 611 F.2d at 110 ). This "universal presumption" is wrong on three fronts.
First, the presumption is wrong as a matter of precedent. The universal presumption language comes from this Court's decision in Maner . 611 F.2d at 110. But Maner clearly misread Cook when it used the language. Compare id. ("[I]t is at least arguable that the universal presumption employed in the Cook case that all banks are federally insured could be applied here."), with Cook , 320 F.2d at 259-60 (noting the "common knowledge of the nearly universal prevalence" of FDIC-insured banks). The Court in Cook noted the universal prevalence of insured status-it said nothing about a universal presumption . The majority never acknowledges this misreading.
As I explained above, the Court in Cook used the universal prevalence language in the context of plain error review, which required the Court to look outside the judicial proceedings. Really, the Court in Cook took judicial notice of the universal prevalence. But that isn't problematic because the fourth factor of plain error review requires courts to consider facts outside the proceedings. Similarly, the Court in Maner effectively took judicial notice of the universal presumption that banks are FDIC-insured. But this is hugely problematic because the Court in Maner did not apply plain error review; it was considering a denied motion for judgment of acquittal on the theory that the government didn't prove insured status. 611 F.2d at 108. And even if Cook had taken judicial notice of this fact when reviewing a denied motion for judgment of acquittal, the Court in Maner could not borrow that finding from Cook and treat it as conclusive. See Grayson v. Warden, Comm'r, Ala. DOC , 869 F.3d 1204, 1224-25 (11th Cir. 2017). The Court in Maner took judicial notice of a disputed fact, clearly violating Rule 201 of the Federal Rules of Evidence. See Fed. R. Evid. 201(b) (noting "[t]he court may judicially notice a fact that is not subject to reasonable dispute"). The majority's analysis highlights the danger in relying on a later case's after-the-fact interpretation of an earlier one.
Second, the jury could not have applied this universal presumption because they *1342 weren't instructed on it. The jury was instructed that its "decision must be based only on the evidence presented during the trial," and it was instructed that the government must prove beyond a reasonable doubt that the Bank's deposits were FDIC-insured. Thus, the universal presumption-which was injected into our case law because Maner misread Cook -should not be part of the sufficiency of the evidence analysis. This is an unremarkable conclusion because, if the majority's statement of the law were correct, the government would be relieved of its duty to prove every element of the crime beyond a reasonable doubt. That would violate the Constitution. See Apprendi v. New Jersey , 530 U.S. 466, 477, 120 S.Ct. 2348, 2356, 147 L.Ed.2d 435 (2000) ("[A] criminal defendant [is entitled] to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (third alteration in original) (quoting United States v. Gaudin , 515 U.S. 506, 510, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) ) ). And even if the presumption didn't violate the Constitution, it would require criminal defendants to prove a negative, and all of the evidence would be in the government's possession.
Third, even if the Constitution permitted this kind of common law presumption in a criminal case, the government doesn't need it. A presumption that some condition exists might be relevant when a district court is deciding whether evidence is admissible. But courts never apply a presumption to help a party satisfy its burden of proof-and, in turn, force the opposing party to present contrary evidence-when the party with the burden of proof already has in its possession all the evidence it needs. In fact, when a party has relevant evidence in his control and doesn't produce it, the failure to produce it can in some cases "give[ ] rise to an inference that the evidence is unfavorable to him." See Callahan v. Schultz , 783 F.2d 1543, 1545 (11th Cir. 1986) (per curiam) (quoting Int'l Union (UAW) v. NLRB , 459 F.2d 1329, 1336 (D.C. Cir. 1972) ). I am unaware of any area of the law that recognizes a presumption to help the party that already has the evidence it needs.
* * *
The majority goes to great lengths to bail the government out. Nothing in our precedent compels this, and the Constitution doesn't allow it. Because I would vacate the conviction, I respectfully dissent.

In Bonner v. City of Prichard , 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down by the close of business on September 30, 1981.

This might not be obvious at first glance because the Court in Cook did not list the four factors of plain error review. I focus my discussion on the fourth factor. Under the first three factors of plain error review, a party must show "(1) the district court erred; (2) the error was plain; and (3) the error affected the party's substantial rights." United States v. Hernandez , 906 F.3d 1367, 1370 (11th Cir. 2018) (citing United States v. Rodriguez , 398 F.3d 1291, 1298 (11th Cir. 2005) ). The majority understandably argues that Cook was analyzing the third factor of plain error review, not the fourth. See Majority Op. at 1332 n.1. Indeed, the Court in Cook did say that the criminal defendant "ha[d] not been deprived of any substantial right." 320 F.2d at 260. Although the Court used the substantial-right language, it couldn't have been applying the third factor. Here's why. The third factor assumes the lower court made an error and basically asks whether the error was prejudicial. See Hernandez , 906 F.3d at 1371 (noting that reviewing courts analyzing the third factor ask whether there is "a reasonable probability that the outcome would have been different if the district court" had not erred). An error like the one alleged in Cook -allowing a conviction to stand even though there wasn't enough evidence to prove an element of the crime-always satisfies the third factor. It's always prejudicial. If the government doesn't prove every element beyond a reasonable doubt, the defendant must be acquitted. So, again, I say the Court in Cook was really applying the fourth factor. It used the universal prevalence of insured status to explain why the general public would not lose sleep knowing that the judiciary allowed this mistake to slide by uncorrected. Because odds are, according to the Court, the bank was insured at the time of the crime.

See id. at 98 n.2.

See 12 C.F.R. § 308.120(a)(3) (listing an insured institution's violation of "an applicable law, rule, regulation, order, [or] condition" as one ground for involuntarily terminating insured status); id. § 327.3 (requiring insured institutions to pay quarterly assessments). See also Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C. , 53 F.3d 1395, 1408 (4th Cir. 1995) ("conclud[ing] that the FDIC has the authority to instigate a termination of insurance proceeding when an institution violates applicable law and withholds portions of its insurance assessments").

I do not mean to suggest that evidence of prior and later insured status is completely irrelevant. I readily agree with Wigmore's inference that prior and later evidence is "some indication" of insured status between the two dates. See Cook , 320 F.2d at 259 (quoting 2 Wigmore, supra , at 413, § 437). But just how indicative are the two pieces of evidence? We don't know. At bottom, "some indication" of insured status is not enough to prove the Bank was FDIC-insured beyond a reasonable doubt.

Platenburg came down a day too late to qualify as binding precedent under Bonner . See Bonner , 661 F.2d at 1207. But it relied exclusively on cases that are binding on this Court. Thus, Platenburg is persuasive authority, and the majority-which included Platenburg when canvassing our precedent-seems to agree.